(February 28, 1914.)

## STATE, Respondent, v. BYRD TREGO, Appellant.

[138 Pac. 1124.]

RAPE—UNCORROBORATED TESTIMONY OF PROSECUTRIX—EVIDENCE—SUFFICIENCY OF—REJECTION OF—ADMISSION OF—INSTRUCTIONS.

1. *Held,* that the evidence is not sufficient to support the verdict.

2. Under the laws of this state, conviction for rape may be had upon the uncorroborated evidence of the prosecutrix; but when the evidence of such prosecutrix is of a contradictory nature or her reputation for truthfulness and veracity is impeached, her testimony must be corroborated or the judgment will be set aside.

3. Where the testimony of a prosecutrix is contradictory or her reputation for truthfulness and veracity is impeached, and the defendant testifies and denies specifically the testimony of the prosecutrix, and his testimony is corroborated, the testimony of the prosecutrix, standing alone, is not sufficient to warrant a conviction.

4. Under the provisions of sec. 6082, Rev. Codes, a witness may be impeached by a party against whom he is called by contradictory evidence or by evidence that his general reputation for truthfulness, honesty and integrity is bad.

5. *Held,* that the court erred in the rejection of certain evidence.

6. *Held,* that the court erred in the admission of certain evidence.

7. *Held,* that it is not error for the court to refuse to give an instruction requested by the defendant where the principles of law therein laid down are substantially covered by other instructions given.

APPEAL from the District Court of the Fifth Judicial District in and for Bingham County. Hon. J. M. Stevens, Judge.

The defendant was convicted of the crime of rape. Judgment *reversed.*

Hansbrough & Gagon and Wm. A. Lee, for Appellant.

While a conviction for rape may be properly had upon the uncorroborated testimony of a prosecutrix, this would only be warranted when the reputation of the prosecutrix for chastity as well as for truth is unimpeached, and when the facts and circumstances surrounding the commission of the offense are in corroboration and not contradictory of the statements of the prosecutrix. (*State v. Anderson,* 6 Ida. 706, 59 Pac. 180; *Tway v. State,* 7 Wyo. 74, 50 Pac. 188; *People v. Wessel,* 98 Cal. 352, 33 Pac. 216; *State v. Donnington,* 246 Mo. 343, 151 S. W. 975; *State v. Goodale,* 210 Mo. 275, 109 S. W. 9; *State v. Brown,* 209 Mo. 413, 107 S. W. 1068; *State v. Baker,* 6 Ida. 496, 56 Pac. 81.)

If the evidence at the trial is contradictory of the evidence before a committing magistrate on a preliminary hearing, and the witness is uncorroborated in that respect, a verdict of guilty upon such evidence without corroboration cannot stand. (*State v. Donnington, supra; Dickey v. State,* 21 Tex. App. 430, 2 S. W. 809.)

Where the prosecutrix on a charge of rape is in no way corroborated and the defendant denies the charge and is corroborated in such denial, the uncorroborated testimony of the prosecutrix, standing alone, is insufficient to warrant a conviction. (*Sowers v. Territory,* 6 Okl. 436, 50 Pac. 257; *State v. Baker,* 6 Ida. 496, 56 Pac. 81; *State v. McMillan,* 20 Mont.

407, 51 Pac. 827; *People v. Hamilton,* 46 Cal. 540; *People v. Benson,* 6 Cal. 221, 65 Am. Dec. 506; *People v. Ardaga,* 51 Cal. 371; *People v. Castro,* 60 Cal. 118.)

In such case the court is warranted in assuming that the jury must have rendered the verdict under the influence of passion or prejudice. (*State v. Baker,* 6 Ida. 496, 56 Pac. 81.)

The court erred in refusing to give instruction requested by defendant, as by refusing to give the instruction he virtually told the jury that the evidence of the complaints proven to have been made by the prosecutrix might be considered by the jury in corroboration of her own testimony, and the court thereby refused to instruct the jury that a failure by the prosecutrix to immediately complain is looked upon as a suspicious circumstance, that her story is a fabrication; the court erred also in failing to instruct the jury that the testimony of said complaints was admitted for the purpose of testing the accuracy and veracity of the prosecutrix and for no other purpose. (2 Brickwood's Sackett's Instructions to Juries, sec. 2820, p. 1795; *State v. Anderson,* 6 Ida. 706, 59 Pac. 180; *State v. Carpenter,* 124 Iowa, 5, 98 N. W. 775.)

J. H. Peterson, Attorney General, J. J. Guheen, T. C. Coffin, Assistants, and J. E. Good, for Respondent.

There is sufficient evidence corroborating the prosecuting witness in this case to warrant the conviction. (*People v. Ah Lung,* 2 Cal. App. 278, 83 Pac. 296; *People v. Allen,* 144 Cal. 298, 77 Pac. 948; *People v. Kaiser,* 119 Cal. 456, 51 Pac. 702; *State v. Downing,* 23 Ida. 540, 130 Pac. 461; *State v. Henderson,* 19 Ida. 524, 114 Pac. 30; *State v. Hammock,* 18 Ida. 424, 110 Pac. 169.)

Evidence of the existence of improper relations between the defendant and the prosecutrix is corroborative of the testimony of the prosecutrix. (*State v. King,* 117 Iowa, 484, 91 N. W. 768–770; *People v. Ah Lung,* 2 Cal. App. 278, 83 Pac. 296.)

Proof of injury to the genital organs of the prosecutrix is always admissible as corroborating her story. The lapse of

time between the act and the examination by the physician goes to the weight of the evidence and not its admissibility. (Underhill on Criminal Evidence, 2d ed., sec. 413; *State v. Scott,* 172 Mo. 536, 72 S. W. 897–899; *State v. King,* 117 Iowa, 484, 91 N. W. 768–771; *People v. Ah Lung,* 2 Cal. App. 278, 83 Pac. 296; *People v. Benc,* 130 Cal. 159, 62 Pac. 404.)

The court properly charged the jury upon the question of corroboration and the refusal to give the instruction requested by the defendant was not error. (*State v. Anderson,* 6 Ida. 706, 59 Pac. 180; *Higgins v. People,* 58 N. Y. 377; *Trimble v. Territory,* 8 Ariz. 273, 71 Pac. 932; *State v. Baker,* 136 Mo. 74, 37 S. W. 810; *State v. Birchard,* 35 Or. 484, 59 Pac. 468; *Bennett v. State,* 102 Ga. 656, 29 S. E. 918; *People v. Estell,* 106 App. Div. 516, 94 N. Y. Supp. 748; Underhill on Crim. Evidence, 2d ed., sec. 411.)

It is error to refuse requested instructions, the substance of which is contained in instructions given by the court. (*State v. Peck,* 14 Ida. 712, 95 Pac. 515.)

SULLIVAN, J.—The defendant, who is appellant here, was informed against upon a charge of statutory rape and convicted and sentenced to a term in the state penitentiary from five to twenty-five years. A motion for a new trial was overruled and this appeal is from the judgment and from the order denying a new trial. The specifications of error go to the insufficiency of the evidence to support the verdict, the admission and rejection of certain evidence and the refusal to give a certain instruction.

The following facts appear from the record: The prosecutrix at the time said crime is alleged to have been committed was in her 16th year of age and would have been sixteen on the following 15th of April, and was in her 17th year at the time of the trial in June, 1913. In 1910 the prosecutrix was living with her mother and sister in Boise, her father being dead. They were occupying a small house with another family consisting of the husband and wife and three children. It came to the knowledge of the probation officers that the

place where the prosecutrix was living was not a proper place in which to bring up children, and the prosecutrix was taken before the probate judge of Ada county, and upon the showing made there was remanded by Probate Judge Brown to the custody and care of the Children's Home Finding Society in Boise. This occurred in 1910, about three months before the prosecutrix became thirteen years of age.

The defendant and his wife, who lived in Blackfoot, Idaho, having no children, were desirous of having a young person in their home for whom they could care and educate, and they concluded to apply to the Children's Home Finding and Aid Society of Idaho (which will hereafter be referred to as the Children's Home) to see if they could find a young girl to take into their home for the purposes above mentioned. Some correspondence or communications were had between them and the persons in charge of the Home which ultimately resulted in the defendant's going to the Home, and after looking the children over he concluded that the prosecutrix would be a proper person for him to take to his home and care for and educate. He returned to his home in Blackfoot and discussed the matter with his wife, with the result that they concluded to take her into their family and rear and educate her. At that time the prosecutrix was in poor health, having a spinal disease which affected her head, and at times had very severe headaches. At the time the defendant was at the Children's Home, above referred to, the disease with which the girl was afflicted was discussed by the superintendent of the Home and the defendant, and the conclusion reached by them was that with proper care she would recover from said disease and become strong and healthy. After the defendant had gone over the matter with his wife in regard to taking the girl into their home, they so notified those in charge of the Children's Home, and about the last week in April, 1910, an attendant from said Home took the girl to Pocatello, or Blackfoot, and delivered her to the Tregos and she entered their home.

The record shows that owing to the physical condition of the girl and the spells of sickness that she was having, the

Tregos prepared a cot or bed in the room in which they slept for the girl, and that during the first year she was with them she frequently had severe attacks of the headache, which occasioned the Tregos some worry and considerable care. The girl continued to sleep in the bedroom occupied by the defendant and his wife for about one year, or until April, 1911, about the time she became fourteen years of age, when a separate room was prepared for her, in which she slept thereafter.

The Tregos during this time cared for the girl, clothed her, sent her to school, had her given music lessons, and cared for her generally as they would have their own child. This condition of things continued up until 1912, when the girl was in her fifteenth year. The record shows that she became restive of the authority exercised over her by the Tregos and went to public dances and other places about town contrary to the wishes and requests of the Tregos, and sometime in 1912 the defendant went to a public dance where the girl had gone against their directions and took her home. This apparently incensed the girl very much and the Tregos were worried about her conduct and finally came to the conclusion that she was a disappointment to them, in that she would not obey them and was not inclined to take the musical and other education which they so much desired to give her. They concluded finally that they would have the authorities at said Children's Home take charge of the girl and relieve them of any further responsibility in that regard, and the superintendent of the Home visited them and the matter was placed before him. The Tregos informed him that the girl had not made good and that they would have to be relieved of her. One of the attendants of the Children's Home, the placing agent, also visited the Tregos and went over the matter with them. This occurred in March, 1913, and the conclusion was reached by said attendant and the Tregos that they would keep the girl until the school year of 1913 closed and then the authorities of the Children's Home should take charge of her.

It appears that said attendant from the Home also went over the matter with the girl, who promised to change her conduct.

Said attendant first visited the Trego home on March 11, 1913, and on the trial testified as follows: "On my first visit to the Trego home, we talked about Nellie not fitting into the Trego home, and perhaps at some indefinite time in the future we might move her. I was there at Mr. Trego's, and had a conversation with Mr. Trego chiefly, in which we decided, he decided, that Nellie should—that I should take Nellie away at such time as we would agree upon." This witness again visited the Trego home on the 17th of April, 1913, and again on the 19th of the same month. It was finally concluded that the girl could not remain until the close of the school year of 1913, and on the 23d of April, 1913, the defendant wired the Children's Home at Boise to send someone to take her away, and on the 28th she was returned to the Children's Home at Boise.

It appears from the record that said attendant had remonstrated with the prosecutrix in regard to her conduct and that she promised to do better, and on the visit of April 19th had a conversation with the girl, concerning which she testified as follows: "I persisted in asking Nellie why she didn't carry out the line of conduct she and I had agreed upon the previous visit and why she was disinterested in her work, and after persisting she said she didn't like Mr. Trego. I insisted upon knowing, since I understood that Mr. and Mrs. Trego had been very kind to her, . . . . and after long questioning she told me that he touched her improperly and where. After stating that he had touched her in a manner that was not proper, I asked her if he had had intercourse. She said he had tried. I insisted upon knowing whether there had been intercourse, and she persisted always in saying he had tried but she prevented him . . . . and after all of that she still insisted that it was true of the attempts but that he had attempted only when she would be in his room."

The evidence clearly shows that the prosecutrix had admitted to the witness that she had not been doing as she ought

to do and had promised to change her conduct, and that on a subsequent visit she admitted that she had not changed her conduct as she agreed she would, and her reason for not doing so was that defendant had mistreated her.

On the 24th of April, 1913, and after it had been determined that the prosecutrix should be returned to the Children's Home in Boise, she made complaint to a Mrs. Austin and a Miss Doyle about the improper conduct of the defend-·ant with her. On the 29th of April, after she had been returned to the Home, the superintendent, Mr. Christian, called Miss Hummer, the placing agent or attendant, before referred to, and the prosecutrix into his office and on the trial he testified in regard to the interview as follows: ''I didn't press the matter then very far; enough to know that irregularities had been going on, and then I telephoned to the prosecuting attorney, Mr. Givens, and asked him to come down, and we pressed the matter then. I asked enough the first time— enough to satisfy myself that irregularities had been going on. I didn't push it to the full extent of an investigation. I didn't interrogate her to the full extent. At the time when we all had her there investigating the matter, at first she didn't tell us that Mr. Trego had had intercourse with her. Q. After some considerable talk to her on the part of Mr. Givens and you all, after having denied it once, she then admitted it; isn't that true? A. It is a fact when we first asked her about it she denied it and afterward admitted it; that is true. I would like to answer the question fully, that's all. The way she answered the question made me feel there was something back of it; that she hadn't told it all. It made me know that she had not told it all. . . . . On the evening of the 21st Miss Hummer came and gave a full report of her visit here and an account of what Nellie had told her. I did not understand from Miss Hummer and the report that she gave me at that time that Mr. Trego had had intercourse with this girl; not fully. I just heard from Miss Hummer what she had heard from Nellie that he had made improper advances. . . . . Miss Hummer told me at that time that Nellie had told her that Mr. Trego had not had intercourse with

her. That is all she told me. Yet in view of that I was suspicious and had a physical examination made upon that information. After I had questioned her and after we had told the prosecuting attorney that she had made the admissions of Mr. Trego's having fully accomplished his purpose, I asked the county attorney if I should call a physician, and he answered, 'Yes, you assuredly call him.' I started the investigation by talking to the girl.'' He further testified that at that interview the prosecutrix admitted to him and the prosecuting attorney that the defendant had had intercourse with her.

Thereupon it was determined to prosecute the defendant for statutory rape. An information was filed and the preliminary examination had and the defendant was held to appear for trial in the district court of Bingham county, with the result above stated.

The trial commenced June 6, 1913, when the prosecutrix was in her seventeenth year, and she testified that in February, 1911, and again in October, 1911, the defendant had fondled her and kissed her and had tried to have intercourse with her; that on or about the 30th of November, 1912, he actually had carnal knowledge of her; that she had one of her headaches and went to her room and went to bed, and during the night she had the nightmare and she got up and went to the bed of the defendant and his wife and got into bed with them, Mrs. Trego lying between the prosecutrix and the defendant; that thereafter Mrs. Trego complained of being too warm and got up and went to the bed of the prosecutrix, and after she left the bed the defendant accomplished his purpose and had sexual intercourse with her.

The defendant and his wife both denied positively that such an incident ever occurred and swore positively that on the occasion when the girl had the nightmare that she did not come to their bed and get in. They both testified that at the time she had the nightmare, November 30, 1912, they both got out of bed and went to her.

The defendant testified, among other things, as follows: ''Since Nellie has been over in her own room, we keep a light

burning in the hall and the door open so the light shines in diagonally across the bed and anyone going in to wait on her does not need the light turned on in the room. It is the same light that lights things up across in our bedroom, and on this occasion I heard something of a scream like it was out of fright and a mutter, and I sprang out of bed and ran into her room, as it seemed to come from there. Mrs. Trego also jumped up and followed in. She was, as I found in there, suffering from nightmare; she was muttering, and I woke her and talked to her and got her out of it and got her soothed and quieted in a few minutes. Mrs. Trego stood looking in the door for a part of the time and Nellie, when she came out of the nightmare, she said she knew it was a dream; I had told her it was,—she thought there was a colored man chasing her. I assured her there was no one after her—it was papa, to go to sleep again. Mrs. Trego stepped into the bathroom for a moment; when she came out she looked into the room again and Nellie was assuring me that she thought it was all right and would go to sleep again. Mrs. Trego went into our room and I followed and nothing more happened that night.''

Mrs. Trego testified as follows: ''I heard the testimony of Nellie Ray in which she stated that she came into our room on the 30th of November, 1912, and got into bed with Mr. Trego and I. I heard that. That is untrue. The time she mentions, about November 30, 1912, I fix it at Thanksgiving time. She had the mumps and was pretty sick and was pettish and we got along with her, and one night, there is nothing which I can recall what night it was, she had a nightmare and made a noise and we both went to her room, about ten feet from ours, and Mr. Trego got there first. He was closest to the door. By the time I got to the door he was kneeling down by the side of the bed, he was soothing her and rubbing her head. I knew what was the matter and I didn't go into the room because I knew she would want me to stay there all night. I didn't think it was necessary, and I went into the bathroom and looked in the door again and went into our room and Mr. Trego followed right after. I don't think it was as long as five minutes. I heard her testimony in which she said

she got into bed with Mr. Trego and I about the 30th of November, 1912, and that I got up out of my bed and went into her room and slept all night and that she slept in the bed with Mr. Trego that night. That is untrue. I heard her testimony when she said that.Mr. Trego on that night, in our bed, had intercourse with her. I will say that at that time, and under those conditions stated by her, it would have been impossible for him to have had intercourse with her without my knowledge. On November 30, 1912, I slept in my own bed with Mr. Trego. I will say that I never, at any time, got out of my bed and went into Nellie's room and slept there and left Nellie with Mr. Trego. I heard her testimony in which she said that some time after November 30, 1912, that Mr. Trego left his bed and went into Nellie's room and slept all night with her. Mr. Trego never to my knowledge left his bed and went into Nellie's room, or into any other room, when we were both at home. I was at home all of the month of December, 1912. Hazel Graham came to our place to stay as our guest about the 1st of December, 1912. She stayed until the 1st of March, 1913. I have nothing to fix those exact dates. I heard the testimony of Hazel [Graham] Davis this morning. I think her statement in regard to that is practically true. When Hazel Graham was at our house she slept with Nellie in the room with Nellie. Between the time that Hazel Graham came to our house and the time she left, she stayed away from our house only two nights; the night of Christmas Eve was one, and on Sunday night before she left for good on the following Saturday night—that would be the last of February, was the other.''

Is it not a little remarkable that if the defendant wanted to make use of this girl he would have had Miss Graham at his home and have her sleep with the girl for two months immediately following the 30th of November when the girl testified the first act occurred?

The prosecutrix testified that some time in February, 1911, when she was sick with one of her severe headaches, she got into bed with Mr. and Mrs. Trego, she on one side, Mr. Trego on the other and Mrs. Trego in the middle, and Mrs. Trego

got up and left the bed and slept on the cot at the foot of the bed, and that she remained in the bed with the defendant until morning, and that he conducted himself in an improper manner toward her but that she had no sexual intercourse with him; that in April or May, 1911, she was taken sick again with one of her severe headaches and was told by the defendant and Mrs. Trego to get in their bed, and she testified that the very same thing happened that did in February prior thereto, but that the defendant did not have intercourse with her. She testified at first that Mrs. Trego got up and went to the prosecuting witness' room but afterward changed that and said she was still sleeping on the cot in the Trego bedroom, and that Mrs. Trego got up and laid down on the cot. The next improper conduct of the defendant she testified occurred on the 30th of November, 1912, as above stated, which was the first time that he had actual intercourse with her. She testified that he had intercourse with her about a month after the 30th of November, and testified as follows: "The first time he had intercourse with me was November 30, 1912. I don't remember when he had intercourse with me the second time. I have not the least idea of when he had intercourse with me the second time. If I could tell you I would. I would not say it is a month because I don't remember. That's the time he had intercourse with me that I forgot about at the preliminary. . . . . The second time and the last time that he had intercourse with me was when he was there in my room. I was sick, and that is the time he put the hot water bottle on the back of my neck. I was very sick at that time. I was sick all the next day. I didn't feel very good the next day after that but I was able to get up and go around. I don't remember; I think I was going to school at that time. I can't fix the time that this occurred any more than it was in the winter following November 30, 1912, when he first had intercourse with me. I know it was in the winter after that, the same winter. I won't fix the time any closer than to say it was the same winter. The last time Mr. Trego had intercourse with me he did not ask me. I did not want him to. I did not tell him I did not want him

to. I let him do as he pleased. I made no complaint imme-
diately after. I did not make any complaint the next morn-
ing or tell anyone soon after. At the time I told Miss Graham
about it, I just told her. She was a friend of mine. I was
not complaining about this when I told Miss Graham. I just
told her as a friend of mine. I did not tell her about this—
this last time—I told her of the first three times that he had
tried to, but I didn't tell her that he really accomplished
sexual intercourse with me. I meant that I left the impres-
sion with her that he had tried three times to accomplish
sexual intercourse—the third time he did, but I didn't tell
her that he did. I did not tell her at that time about the
fourth time. I didn't tell her about that [meaning the fourth
time] because I didn't want to. When I first told anybody
about this last time, the time we are talking about now, was
Mr. Good and Mr. Holden. I told them about it—it was
shortly after the preliminary hearing. Maybe it was the next
Friday after the preliminary hearing. It was Mr. Harry
Holden I told. I had never met Mr. Holden before. That
was the first time I had met him and I told him about this
instance.''

She testified as to certain improper conduct of the defend-
ant toward her in February, 1911, next in April or May, 1911,
but at neither of these times did he have intercourse with her,
and the first time he had intercourse with her was on No-
vember 30, 1912. Thereafter she testified that he came to
her room some time during the winter following November
30, 1912, and stayed with her all night and had intercourse
with her twice. At the preliminary examination she appar-
ently had forgotten all about the defendant's sleeping in her
bed all night and having intercourse with her twice. She
testified at the preliminary examination that on November 30,
1912, he did not penetrate her to any extent. On cross-ex-
amination, after the prosecutrix had testified in regard to the
act of November 30th, the following questions were asked:
''Q. Well, was that the last time? A. Yes, sir. Q. Never
anything happened since then? A. No, sir. Q. Have you
ever been in his bed since that time? A. No, sir. Q. Was

he in yours? A. No, sir.'' There she testified positively that the only sexual intercourse defendant had with her was on November 30, 1912, but on the trial, which occurred about four weeks after the preliminary examination, she testified that about a month afterward, or during the winter after November 30, 1912, the defendant had come to her room and slept with her all night and had intercourse with her twice, and on being questioned in regard to the matter, she testified that she had forgotten that incident and it was only called to her mind by Mr. Harry Holden, one of the attorneys for the prosecution.

It is very remarkable that the prosecutrix, who admits she had illicit relations with the defendant once and swore positively that she had had no such relations with him whatever since November 30, 1912, should have forgotten that the defendant came to her bed about a month later and remained with her all night and had such relations with her twice. Is it possible that a young woman in her sixteenth year, as bright as the evidence would indicate the prosecutrix is, should forget the second time she had illicit relations, where the defendant had remained in bed with her all night, and should only remember such an important event in her life when it was called to her mind by one of the attorneys for the prosecution? Such a story is unworthy of belief and it seems to me would brand, to the unprejudiced mind, the testimony of the prosecutrix as absolutely false. Her evidence shows that on the night of November 30, 1912, she had a nightmare and thought a colored man was chasing her. Is it not more probable that someone recalled to her mind a hideous nightmare rather than a forgotten fact of such an important event in a young woman's life as she testified occurred in the winter following November 30, 1912?

Again, on the trial the prosecutrix testified that the first intercourse had with her by the defendant hurt her. She testified as follows: ''Now, going back to November 30, 1912, the time Mr. Trego had intercourse with me the first time, I say it hurt me; I say I didn't bleed any at that time. I had pain from it a couple of hours. It was painful but I didn't

bleed any." On the preliminary examination had only about four weeks before the trial, she testified as follows: "Q. I will ask you whether or not it caused you pain or anything of that kind? A. No, it did not." Here she testified that the first time intercourse gave her no pain and then on the trial she testified that it gave her considerable pain but that she did not bleed any. The prosecution evidently concluded that a virgin who had never been tampered with would experience some pain the first time she had sexual intercourse provided she had a hymen intact, hence she testified on the trial that it did give her pain although on the preliminary examination she testified positively to the contrary. The reason for this change in her testimony evidently was that the prosecution undertook to show that on November 30th she was a virgin and that the defendant on that night robbed her of her virginity, and in some way which does not appear from the record, probably some friend advised her, that to be a virgin with a hymen intact and have intercourse with a man meant that there must be some pain and very likely some hemorrhage, for it is evident if there was laceration there would be bleeding, and when she swore on the trial that the pain was quite intense, that called for the question as to whether or not there was any hemorrhage and she swore positively that there was not.

A physician was called as a witness on behalf of the defense in regard to these matters, and testified that in his experience as a physician for thirty years, he would say that a virgin with her hymen intact, having intercourse with a man, there would be laceration of the tissues and naturally some show of blood, and that where there was great pain accompanying intercourse, lasting for more than two hours, as testified to by the prosecutrix, there would be laceration and hemorrhage. The state undertook to show, and did show, that the prosecutrix was examined by a physician soon after she returned from the Tregos and prior to the preliminary examination, and he testified on the trial that he found the vagina dilated and the hymen punctured—ruptured hymen—and that the condition found there would not be a test of virginity, as those

conditions might arise from other sources than sexual inter-
course. The state introduced this evidence for the purpose of
corroborating the testimony of the prosecuting witness as to
intercourse.

The testimony of the prosecutrix being so conflicting, and
a part of it so contrary to common knowledge and experience,
seriously affects the credibility of the witness, when taken
into consideration with her other false and contradictory state-
ments contained in the evidence. And the defendant went
upon the stand and denied in detail the evidence of the
prosecutrix.

We will next consider the extent or weight of the evidence
of corroboration that her statement and complaints to others
of this tragedy has under the law.

The prosecuting witness testified on her preliminary ex-
amination that she had told Hazel Graham, a young woman
who was living at the Tregos and roomed with the prosecuting
witness, about the month of January, 1913. They slept to-
gether in the same bed from December 1st until March 1st,
with the exception of two nights. The prosecuting witness
testified as follows: "Q. How did you come to tell her? A.
Well, I don't know just how it was. We were discussing
something so I happened to tell her. Q. You were talking
about intercourse with somebody—you and Miss Graham? A.
No, sir; I don't think so. Q. Do you remember the first
words that you told her? A. I think I said that Mr. Trego
had done things that were not nice to me. Q. Where were
you when you told her that? A. In bed. Q. Had she said
anything to you about it when you told her this? A. No, sir.
Q. You just happened to speak up and say Mr. Trego had
done things that were not nice to you. A. We were discussing
things about the home and Mr. and Mrs. Trego, so I just said
that. Q. What did she say when you told her? A. She said
it was terrible and she was shocked. Q. Did she advise you
to tell anyone else? A. No, sir. Q. Did she advise you to
keep quiet? A. No, sir."

Miss Graham also testified that the prosecutrix had com-
plained to her about the defendant's conduct to her substan-

tially as testified to by the prosecuting witness. She also testified that she roomed at Tregos from the 1st of December until the 1st of March and slept with the prosecuting witness during that time, except two nights—one night about Christmas time and the other the latter part of February.

The prosecutrix testified that she next told Mrs. Austin the latter part of April, 1913, and the next person she told was Miss Hummer, about the same time, and then she told Miss Doyle and then Mrs. Trego on or about the 26th of April, 1913. It appears that she told none of these people of the acts of the defendant except Miss Graham until it was determined that she must leave the Trego home and go back to the Children's Home in Boise. The prosecutrix evidently gave these various persons above mentioned to understand that defendant had had improper relations with her, and in regard to this matter she testified as follows: "I didn't tell them just what I told here to-day. I told them that Mr. Trego had tried. I told Miss Hummer that he hadn't had intercourse with me. I told Miss Doyle the same. I told Miss Doyle and Mrs. Austin that he had tried to but had not had intercourse with me. I don't remember of testifying at the preliminary examination that I had told all of these people just what I had testified to on direct examination and that was that Mr. Trego had had intercourse with me." It is evident that she did not tell some of the above-mentioned persons that he had had actual intercourse with her but gave them to understand that he had done so.

Mrs. Austin testified on the trial that the prosecutrix made complaint to her in regard to improper relations between her and the defendant about the 21st of April, 1913; that she stated the nature of those improper relations. She testified that the prosecutrix came to her place—it was close by the Trego home, and asked her if she could keep a little secret. Mrs. Austin replied that she did not want her to tell her any secret from her home, and the girl replied that she was going to change her home; that she was going back to the Children's Home in Boise. She then told her of the improper relations between defendant and herself. Mrs. Austin testified as fol-

lows: "I said, 'Nellie, do you realize what you are saying? You simply could break up that home and break your mother's heart,' and she said, 'Mrs. Austin, that's the reason I have never told it, because mamma—it would break her heart. I have only told Hazel Graham, she was at the house, and Miss Hummer. Aside from that I have not told anyone about this,' and I asked Nellie—I said, 'Nellie, are you in trouble?' and she said, 'I am not'; and I talked to her quite a little while and I said, 'You must be careful what you say. It is too serious a matter,' and I talked to her and Mr. Austin came in and we didn't tell him but just a little."

The conversations that occurred between the prosecutrix and Miss Hummer are above set forth, but she did not tell Miss Hummer that defendant had had intercourse with her. In fact, she told her he had not.

Miss Beach testified on behalf of the state that she roomed at the Trego home from September 10, 1910, until the 4th of October, 1911; that the prosecutrix was living at the Trego home at that time; that she saw irregularities between the defendant and the prosecutrix; that she saw the defendant caress her in a way that a father should not caress his own daughter; that she saw the defendant in the girl's room on his knees by the bed and was kissing her and smothering his mouth over her face; the girl had been ill; that he was talking to her and she was restless; that she saw the defendant in the girl's room just once; it was early in the morning, about breakfast time; that one of the attorneys for the defendant had taken the witness quite by surprise in that he wanted to know what she knew about this matter, and witness testified that she evaded it and only told him a part of the truth and that she was thankful that she had not disclosed more than she did to said counsel. She testified as follows: "You came there and took me by surprise and I will admit evading your question and I didn't tell you anything that was not the truth but I didn't tell you all the truth, Mr. Hansbrough. The reason I didn't, I knew you were the attorney for the other side. As to whether it is safe to tell the truth to either side, I don't think you have the right. . . . . When you asked me

if I saw anything wrong the morning I saw him in her room, I started and I said, 'Well, perhaps not criminally wrong; I won't say I never saw anything wrong.' . . . . I didn't say at that time that I thought nothing of it, but at that time it didn't look so bad to me; that is what I said.''

The testimony of this witness as it appears in the record would indicate that she did not think much of the action of the defendant toward the girl until this matter came up and then she was impressed with the idea that his conduct was not proper. She only saw him in the girl's room once and then when the girl was sick. If she had been candid in the matter, I fail to understand any reason why she would not tell to either the prosecution or counsel for the defendant what she had seen and observed. She evidently classed herself as a witness for the state and was determined to do for the state what she could, and did not intend to reveal anything that she knew to counsel for the defendant. The state is not interested in convicting any person charged with a crime unless he is really guilty, and it seems to me that no candid witness would hesitate to state what he or she knew about an alleged crime either to counsel for the state or to counsel for the defendant, so that the defendant might have the opportunity to procure proper evidence to explain any suspicious circumstances or other facts tending to show the defendant guilty, if it were possible for him to do so.

Mrs. Trego testified that the first intimation she ever had that defendant had had intercourse with the prosecutrix was on the 26th of April, 1913, and she testified, among other things, as follows: ''And she needed a pair of shoes, so Saturday afternoon we went up and got those shoes. When we came back, I don't know just what she said about them, anyway I replied, 'Papa is the one you will have to thank for those shoes,' and she became sullen and saucy and impertinent. I can't recall just the details about it, and on my inquiry as to the cause of this she said she was mad, and I asked her what was the matter, and she said she wouldn't thank him for anything, and she said she wouldn't take anything with her that he had given her, and I said, 'You will go empty-handed

then, for he has paid for everything you have,' and she still was so sullen and impertinent that I boxed her jaws, and she said if I knew what she did I maybe wouldn't get mad at her, and I asked her, 'What is that?' and she was evasive and didn't want to tell, and she said that papa had not treated her well, and I asked her in what respect, and she said, 'Well, he has used me like he does you sometimes,' and I said, 'Nellie, when did this happen?' and she said, 'The time I was in your bed when I was sick.' I said, 'Do you mean when you were sleeping in our room?' and she said 'Yes.' I said, 'Nellie, how many people have you told this to?' and she said, 'No one but Miss Hummer.' I said, 'You are sure of that?' and she said, 'No, mamma, no one but Miss Hummer.' ''

This conversation occurred about two days before the girl was returned to the Children's Home at Boise. After she had been returned to the Home, on the 29th of April, 1913, the superintendent of the Home, Mr. Christian, testified as above set forth. He also testified that the girl denied that the defendant had had intercourse with her, but the way she answered the questions made him feel that there was something back of it—that she had not told all. He called into consultation at that time, or shortly after, Miss Hummer and the county attorney, Givens. He testified that he did not understand from Miss Hummer that the defendant had had intercourse with this girl. The following question was asked: "After some considerable talking to her on the part of Mr. Givens and you all, after having denied it once, she then admitted it; is not that true? A. It is a fact that when we first asked her about it she denied it and afterward admitted it; that is true." And he testified: "Yet in view of that I was suspicious and had a physical examination made upon that information. . . . . I started the investigation by talking to the girl. We talked to the girl and that called the attorney, and talking to the attorney, the admission called the doctor."

The state places great reliance upon the admissions of the girl as corroborative of her statement in regard to the criminal relation with the defendant.

The following is a summary of this matter: She first told Miss Graham, merely incidentally, while they were sleeping together one night some time during the winter of 1912–13, a month or more after the alleged criminal act, and told no other person until April 19, 1913, after it had been determined that she should be returned to the Children's Home. From April 19th to April 26th she told Miss Hummer, Mrs. Austin, Miss Doyle and Mrs. Trego, and on the 29th of April, after being questioned by Mr. Christian, she denied it. But, as stated by Mr. Christian, he was not satisfied with her statement and was suspicious and called to his aid Miss Hummer and the county attorney and he again questioned her, and as I understand his evidence, in the presence of the county attorney, at least, she admitted that the defendant had had criminal intercourse with her. It does not appear from the record how much questioning it required to have the girl make this admission after having denied it. But even then Mr. Christian was suspicious and had a physical examination made by a physician.

Is it not surprising that Mr. Christian, after the girl had positively denied the criminal relation, and when he knew at that time that the girl was not pregnant, should start a prosecution that must of necessity so greatly affect adversely the future life of the girl that had been placed in his care for protection? It is laudable to prosecute criminals, but under the circumstances of this case, when the result of the prosecution might blast the life of the girl, whether the defendant was convicted or not, it would seem that the serious results of the case would have caused him to hesitate and consider well whether his greater duty lay in protecting the girl or in attempting to punish the defendant.

The veracity and truthfulness of the girl was put in issue. She admits time and again that she made false statements in regard to these various occurrences, and it clearly appears that she testified falsely on both the preliminary examination and on the trial. She positively testified on the preliminary examination that the defendant had only had intercourse with her once, and that on November 30, 1912, and on the trial she

testified that she had forgotten that the defendant came to her room a month or so after the first act and remained in her bed all night and had intercourse twice. Her testimony is so contradictory that her statements and complaints cannot be accepted as a corroboration of the main fact, and it is well settled that where the testimony or statements of the prosecuting witness are contradictory or her reputation for truthfulness and veracity is impeached by persons who know her well, her testimony must be corroborated in order to convict, and this court will not let a verdict stand for so grave a crime upon such unsatisfactory and uncorroborated testimony.

As touching upon this question, see the recent case of *State v. Tevis*, 234 Mo. 276, 136 S. W. 339. The law upon the question of corroboration is thus stated by that court: "A conviction in cases of either incest or rape may be had upon the uncorroborated evidence of the prosecutrix, but when the evidence of such prosecutrix is of a contradictory nature, or when applied to the admitted facts in the case her testimony is not convincing but leaves the mind of the court clouded with doubts, she must be corroborated or the judgment cannot be sustained."

The prosecutrix admitted on the trial without hesitancy that she had testified falsely. She also testified that she knew nothing about sexual intercourse and sexual matters until Mrs. Trego gave her some information after she became fourteen years of age. The defendant, to show the falsity of that testimony, offered to prove by two witnesses, Mr. and Mrs. Morton, who had been her teachers at the Cole school in Ada county for about nine weeks, that the girl knew all about such matters and frequently talked of them and accused boys and girls then attending that school of having intercourse with each other, and used the most vulgar terms that could be used in such conversations. The trial court rejected such offered evidence, which action of the court is assigned as error. This evidence was offered to show that the girl was not truthful and her reputation for truthfulness was brought prominently before the jury, and this offered testimony should have been received by the court and it was error to reject it.

In rebuttal the witness Christian testified that he had heard that testimony and the statement that Nellie knew of these things and that that testimony was false "so far as my knowledge of the girl is concerned." The witness thus tried to impress upon the jury's mind that that testimony was false, when as a matter of fact the evidence shows that he had seen the girl but once or twice in about three years. Is it not surprising that a witness of the character and standing of the one under consideration would swear that the testimony of certain reputable witnesses is false when his testimony shows that he knows nothing at all about the testimony he branded as false? It only serves to show how far wrong zeal may carry a good man.

The state sought to corroborate the girl by showing that her hymen had been ruptured. A physical examination was made about four months after the alleged act of intercourse, and the physician testified that on such examination he found a punctured or ruptured hymen; that the condition found there might have been caused without having had intercourse, and stated by what other means said condition might have been caused, and that the condition that he found there would not be a test of virginity. Upon this point see Beck's Medical Jurisprudence, p. 150; Gray's Anatomy, 10th ed., 1041. The case of *Kee v. State* (Tex. Cr.), 65 S. W. 517, as we view it, was a stronger case than the one at bar, but it was reversed by the appellate court on the ground of the insufficiency of the evidence.

The record shows that after the Tregos had had charge of the prosecutrix for about two years and a half, she became unruly and disobedient and began to stay out nights and to go to public dances against their will and without their knowledge. The time arrived when she must change her conduct or go back to the Children's Home. Prior to the time it was determined that she should be returned to the Children's Home, she had told only one person of her criminal relations with the defendant, but after it was so determined that she must return to the Home, she told several persons, or intimated to them that the defendant had not treated her right.

She did not want to return to the Children's Home at Boise, and the record indicates that since she must do so, she desired to vent her ill-feeling in some manner that would injure the Tregos. As I view the evidence, the prosecutrix was not corroborated on any material point on the charge of rape, and she is contradicted on all the material points by competent evidence. It is clear that the evidence is not sufficient to warrant a conviction, and that the verdict of the jury was the result of passion and prejudice and not because the evidence was sufficient to sustain it. It has been held in many cases that where the prosecutrix on a charge of rape is in no way corroborated and the defendant denies the charge and is corroborated in such denial, the uncorroborated testimony of the prosecutrix, standing alone, is insufficient to warrant a conviction. (*Sowers v. Territory,* 6 Okl. 436, 50 Pac. 257; *State v. Baker,* 6 Ida. 496, 56 Pac. 81; *State* v. *McMillan,* 20 Mont. 407, 51 Pac. 827; *People v. Hamilton,* 46 Cal. 540; *People v. Benson,* 6 Cal. 221, 65 Am. Dec. 506; *People v. Ardaga,* 51 Cal. 371; *People v. Castro,* 60 Cal. 118.)

In the case of *State v. Baker,* 6 Ida. 496, 56 Pac. 81, this court said: "We have examined the record in this case with much care. The crime charged is the most heinous known to the law. It seems a strange thing to say, but our experience almost compels us to the belief that, the more monstrous the crime charged, the more readily are juries inclined to give credence to it, and the less proof is required to establish it. In this case, the only evidence against the defendant was the testimony of the prosecutrix, a girl some fifteen years of age, and, judging from the testimony in the case, not of the most exemplary or amiable character. She is not in a single particular corroborated; on the contrary, she is flatly contradicted upon the most material points by several witnesses, no one of whom was contradicted or impeached, or sought to be. We think before a father should be immured in a prison for what in this case virtually amounts to imprisonment for life, his conviction should be supported by something more than the uncorroborated statements of a wayward and vindictive girl,

whose proclivities, it is shown by the evidence, tend not in the direction of virtue.''

Under the provisions of sec. 6082, Rev. Codes, a witness may be impeached by a party against whom he is called by contradictory evidence or by evidence that his general reputation for truth, honesty and integrity is bad.

From the entire evidence, this court is warranted in assuming that the jury must have rendered the verdict under the influence of passion and prejudice.

Several errors are assigned on account of the action of the court in admitting certain evidence which was objected to by counsel for the defendant.

There is no merit in the fifth error assigned, as the subsequent testimony of the prosecutrix showed that she never had been pregnant.

The court erred in refusing to let witness Christian answer the questions involved in the sixth, seventh and eighth assignments of error, and also in refusing to let witnesses answer the questions involved in the tenth, eleventh and thirteenth assignments of error. The evidence there offered went to the girl's truthfulness and credibility and tended to impeach her character for truthfulness.

While the action of the court is not reversible error, under all of the facts of this case, in not permitting Kestner to answer the questions involved in assignment of error No. 12, the court should have permitted the witness to answer the question, as it was for the purpose of qualifying the witness and to show that he gave testimony of the knowledge he had of the girl's conduct in the community where she lived.

The court did not err in its rulings involved in assignments Nos. 14, 15, 16 and 17. We would suggest, however, that considerable latitude should be allowed in cross-examining a witness as to dates and occurrences, sufficient to test the reliability of the memory of the witness.

The court erred in permitting the witness Beebe to answer the question involved in assignment No. 18.

Assignment No. 19 involves the motion to strike out the testimony of the witness Beach. This witness testified in re-

buttal to certain conduct she had observed between the prose-cutrix and the defendant one morning about 8 o'clock when the girl was sick; that she saw him kissing and caressing her and that she did not think much of it at that time. This evidence was not properly rebuttal, but it was not reversible error for the court to permit the introduction of that evidence as it did. We have referred heretofore to the testimony of this witness.

Assignments Nos. 20, 21, 22 and 23 involve the action of the court in refusing to strike out the testimony of certain character witnesses. Said witnesses testified that the reputa-tion of the prosecutrix for truthfulness was good and on cross-examination they show they knew nothing about her reputa-tion as they had never heard it discussed by anyone. Since it appeared that they did not know the reputation of the prose-cutrix and had never heard the matter mentioned, the evi-dence given by them was incompetent and irrelevant and should have been stricken out.

It is next contended that the court erred in refusing to give defendant's instruction No. 1. While that instruction states the law applicable to the facts of this case substantially correct, yet we think that the instructions given by the court covered substantially the same ground as said requested in-struction, and for that reason it was not reversible error on the part of the court to refuse to give said requested in-struction.

We therefore conclude that the evidence is insufficient to warrant a conviction or sustain the verdict, and for that reason and for the many errors of law committed during the trial, the judgment must be reversed and a new trial is ordered.

Stewart, J., concurs.

AILSHIE, C. J., Dissenting.—I am unable to agree to a reversal of the judgment in this case. This court should not usurp the functions of the jury, and the jury have heard the evidence and twelve men have returned their unanimous ver-dict of guilty, and the trial judge who heard all the evidence

approved the verdict and pronounced judgment and sentence accordingly. There was a sharp conflict in the evidence in this case, as there always is in cases of this kind, but the jury evidently believed this young girl, who claims that her person has been outraged, and gave credence to the witness who corroborated her story. If, however, this girl is unworthy of belief, as my associates suggest, and the testimony of Rev. Mr. Christian and the county school superintendent of Bingham county corroborating her story are to be disregarded, then I fail to see why the court should order a new trial. This is undoubtedly all the evidence there is in the case, and I fail to see why the matter should be longer drawn out in the courts.